IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

PAUL WEEKS   *

v.   *   Civil Action No. CCB-10-3432

DORCHESTER COUNTY DETENTION
CENTER, *et al.*   *

  *
***

## MEMORANDUM

Now pending is the defendants'[1] motion for summary judgment. (*See* ECF No. 38.) Plaintiff Paul Weeks opposes the motion. (*See* ECF No. 42.) The court finds a hearing in this matter unnecessary. *See* Local R. 105.6. For the following reasons, the defendants' motion shall be granted, and judgment shall be entered in their favor.

## BACKGROUND

Weeks alleges a series of events beginning with his arrest and transport to the Dorchester County Detention Center on September 6, 2009. (Compl., ECF No. 1, at 4.) According to Weeks, when he arrived, he failed to answer questions asked of him during the intake procedure. (*Id.*) Weeks was instructed to change his clothes, but when he attempted to comply, Corporal[2] Stanley stated that she was tired of "messing around with" him. (*Id.*) In reply, Weeks called her a "bitch." (*Id.*) Corporal Stanley then asked her co-workers to "get the Cadillac."[3] (*Id.*) Weeks denies threatening any of the officers or acting in a violent manner. (*Id.*)

---

[1] The defendants include the Dorchester County Detention Center and a number of correctional officers who worked at that institution during the events alleged in this case.
[2] Weeks refers to Stanley as "Officer Stanley," but it appears her correct title is "Corporal Stanley."
[3] Weeks suggests that officers use this term to refer to the Portable Detention Unit ("PDU"). (*See* ECF No. 42 at 2.)

Officer Wheatley ordered Weeks to walk down a narrow passage across the room, and he complied. (*Id.* at 4, 7.) Weeks claims that Corporal[4] Schuyler then hit him in the chest with two open hands, knocking him backward to the floor. (*Id.* at 7.) Officers Wheatley and Batson picked Weeks up from the floor. (*Id.*) When Weeks asked why he was hit, Corporal Schuyler responded that Weeks had been "resisting." (*Id.*) Upon being helped to his feet, Weeks was leaned over a table and placed in handcuffs. (*Id.*) He was then forced to sit in the PDU, which Weeks describes as a chair mounted to a platform with wheels. (*Id.*) He claims that his feet were shackled to the platform, and that he was rolled into the visiting room, as ordered by Corporal Stanley. (*Id.*) According to Weeks, he stayed there for "two hours or so" before a nurse came to check on him.[5] (*Id.*)

Shortly after Weeks was examined by the nurse, he was rolled into the gym, where he was positioned in front of a large fan. (*Id.*) He claims that he was left there "for a long time." (*Id.*) Eventually, Corporals Stanley and Schuyler and Officers Wheatley and Batson came back to the gym, and ordered Weeks to stand up so that his handcuffs could be checked. (*Id.*) Weeks explained that his ankles were "lock[ed] tight with chains to the platform," causing him too much pain to stand. (*Id.*) Officers Wheatley and Batson lifted him up by grabbing him under his arms. (*Id.*) Then, Corporal Schuyler "ran into [him]" and kicked him with his knee, knocking him back into the chair. (*Id.*) Weeks's handcuffs were tightened, and he cried out, telling the officers that he had hurt his back. (*Id.*)

Weeks alleges that, after about an hour, the officers removed him from the gym, and placed him "in a room in front of a vent." (*Id.* at 8.) The room was very hot, and he had difficulty breathing "because of the bag over [his] head." (*Id.*) After about an hour in this room,

---
[4] Weeks refers to Schuyler as "Officer Schuyler," but it appears his correct title is "Corporal Schuyler."
[5] Weeks alleges that he was experiencing chest pains. (Compl. at 7.)

2

he was removed from the restraints. (*Id.*) Claiming cruel and unusual punishment, Weeks alleges that he spent a total of four hours restrained in the chair. (*Id.*)

On September 9, 2009, Weeks was released to the custody of the Dorchester County Sheriff's Office. (*Id.*) The officers took him to the hospital, where he received an x-ray to his back and shoulder. (*Id.*) Weeks recalls that he was given medication and advised to "seek help" from his doctor upon his release. (*Id.*) Although his shoulder injury has healed, Weeks continues to suffer from the injury to his back. (*Id.*)

On September 12, 2009, Weeks alleges that he went to the County Commissioner's Office to file a complaint regarding his treatment at the detention center, but his complaint was not accepted because he did not know the names of the officers. (*Id.* at 9.) The Commissioner tried calling the detention center to get the officers' names, but he was not successful. (*Id.*) Additionally, the State's Attorney advised that he would conduct an independent investigation into his claims. (*Id.*) Weeks concludes that, when he attempted to follow up with the State's Attorney's Office, he was told that they were waiting for a report from the Maryland State Police. (*Id.*)

The defendants' reports indicate a very different version of events. They assert that, on the morning of Weeks's arrest, Corporals Schuyler and Stanley went to the sallyport area of the detention center to accept custody of Weeks. (*See* ECF No. 38-4, Ex. 2, at 12, 14.) Weeks looked very angry and, when Corporal Schuyler asked him for his paperwork, he responded in a hostile manner. (*Id.*) Corporal Schuyler told Weeks that he would carry the papers into the facility. (*Id.* at 12.) He then took the papers from Weeks and led him into the sallyport area; however, Weeks continued to act belligerently, and additional assistance was required. (*Id.* at 14, 16–17.) After calling for assistance, Corporal Stanley left the processing area. (*Id.* at 14.)

Weeks was uncooperative during processing, refusing to answer Officer Wheatley's questions and calling the officers pejorative names. (*Id.* at 12, 16–17.) Corporal Schuyler advised Weeks that he would be put on "observation watch" if he did not answer the questions. (*Id.* at 12.) When Corporal Schuyler notified Corporal Stanley of Weeks's continued bad behavior, she advised that Weeks should be stripped of his clothes and placed in the observation unit where he could be watched. (*Id.* at 12, 14.)[6]

Corporal Stanley returned to the processing area and, when she arrived, she heard Corporal Schuyler telling Weeks to remove his clothes so that he could change into detention center clothes. (*Id.*) Weeks refused, and stated that he did not know who had previously worn the detention center shorts. (*Id.* at 14.) After advising Weeks "several time[s]" that he had to change his clothes, Corporal Stanley told the officers to place him in a "suicide wrap." (*Id.*) She also told Weeks that he would be placed in "medical observation" and would not be permitted to use the phone until he was cooperative. (*Id.* at 15.) Weeks finally relented, removed his clothing, and allowed officers to put on the suicide wrap. (*Id.* at 16–17.)

When Weeks was being escorted to the observation cell by Officer Batson, however, he pulled away from the officer. (*Id.* at 15–16.) In response, Officers Batson and Wheatley attempted to restrain Weeks, and Corporal Schuyler placed both hands on Weeks's chest to prevent him from moving forward. (*Id.* at 12, 15–16.) Weeks called Corporal Stanley a "bitch," and Corporal Schuyler then pressed Weeks against a table and told him that could not be disrespectful toward the officers. (*Id.*) Nevertheless, Weeks continued to physically resist and to use foul language toward the officers. (*Id.*)

In light of Weeks's continued resistance, Corporal Stanley decided to place him in the PDU. (*Id.* at 15.) He was handcuffed and placed in leg irons, and Medic Wendy Jones was

---

[6] Corporal Stanley suspected that Weeks was under the influence of a substance. (*See* ECF No. 38-4, Ex. 2, at 14.)

called in to check the restraints.[7] (*Id.*) After Jones approved the restraints, a "spit mask" was placed over Weeks's face. (*Id.* at 16.) He was then transported to the inmate visitation area. (*Id.*) Weeks was restrained in the PDU from approximately 9:25 a.m. to noon, during which time he was monitored periodically by both correctional staff and medical staff. (*Id.* at 17, 19, 22; *see also* ECF No. 38-6, Ex. 4, at 17.)

During the process of monitoring Weeks's medical condition, he refused to answer questions about how he was feeling. When Jones did her initial check of Weeks's restraints and asked if he was alright, he refused to answer. (ECF No. 38-6, Ex. 4, at 2.) When he was asked again approximately 45 minutes later, he kept his head down, said nothing, and continued tapping his feet. (*Id.*) Weeks was moved approximately 20 minutes later to the gym area and Jones checked on him again. (*Id.*) At this time, Weeks reported experiencing chest pains and pain in both arms. (*Id.*) When asked if the pain was new, Weeks initially refused to respond, but after being asked a second time, he said, "it don't matter." (*Id.*)

Jones took Weeks's blood pressure while he was seated in the PDU and obtained a reading of 143/112. (*Id.*) Jones asked Weeks to stand up so that she could take his blood pressure again without the handcuffs. (*Id.*) When Weeks stood up, his knees buckled, and Corporal Schuyler and Officers Hurt and Wheatley held him up so that Jones could take his blood pressure. (*Id.*) When he was being assisted back into the PDU, Weeks stiffened his body. (*Id.*) The restraints were re-applied and checked by Jones. (*Id.*) Jones asked Weeks if he took blood pressure medication, but he once again refused to answer. (*Id.*)

Jones decided to contact Registered Nurse Whitman, who advised her to get in touch with Physician's Assistant Johnson. (*Id.*) Johnson requested that Weeks be sent to Dorchester General Hospital for an evaluation. (*Id.* at 2–3.) When Corporal Stanley was informed of the

---
[7] The defendants do not specify how long Weeks was restrained before his restraints were checked by Jones.

5

medical concerns, she consulted with Captain Mills, who advised that he should be moved to the processing area for monitoring. (*Id*. at 3.)

Shortly after Weeks was moved to processing, Jones asked him if his chest pains had subsided, and he indicated they had not. (*Id.*) Jones asked if the pain felt "like an elephant was sitting on his chest;" Weeks said that the pain was "just hard." (*Id.*) Next, Jones asked Weeks to rate his pain on a scale of 1 to 10, and Weeks indicated the pain was a 10. (*Id.*) Jones continued to ask Weeks medically related questions, but he refused to answer and told Jones he wanted to die and that they are "killing him slowly." (*Id*.) When Jones assured Weeks she wanted to help him, but could not do so if he would not answer her questions, Weeks lowered his head and stopped talking. (*Id*.)

At 11:30 a.m., Jones again checked on Weeks and asked if the pain was worsening. (*Id.*) Weeks refused to answer and stared straight ahead. (*Id.*) When Jones updated Johnson on Weeks's condition, Johnson advised her to ask Weeks if he had any allergies and, if he did not, to administer Clonidine. (*Id*.) At about noon, Jones obtained Corporal Stanley's approval to have Weeks taken out of the PDU. (*Id.* at 4.) Jones told Weeks about the order for Clonidine, and Weeks took the medication, stating he had taken medication for hypertension previously but was unsure what it was called. (*Id.* at 3.) Weeks also related that he did not have anyone to bring the medications to him. (*Id*. at 3–4.)

Weeks was moved to a detoxification cell at 12:13 p.m. (*Id.* at 4.) At that time, Jones checked the circulation in his hands and feet as well as his blood pressure. (*Id.*) She received a reading of 158/92. (*Id.*)

The following day at 8:45 a.m., the doctor came to Weeks's cell to examine him. (*Id*.) Weeks was laying on his bunk when the doctor arrived, made poor eye contact, and was reluctant

to answer questions. (*Id.*) He allowed the doctor to check his blood pressure and confirmed he had a history of hypertension, although he did not know what medication he took for it. (*Id.*) In addition, Weeks told the doctor he suffers from depression but does not take medication to treat it. (*Id.*) He would not allow the doctor to evaluate his complaint of stomach pain, which he attributed to being punched in the stomach by officers the day before. (*Id.*) Weeks was refusing meals and told the doctor that he was "gonna die here anyway." (*Id.*) Weeks refused to sign forms as requested by the doctor, and commented that he "needs nothing." (*Id.* at 5.)

When the doctor contacted Weeks's brother, who had not seen Weeks in several years, he learned that Weeks's behavior was uncharacteristic. (*Id.*) Weeks's brother also related that he was on medication for his blood pressure. (*Id.*)

At noon, Weeks requested to see the doctor because he needed something for his pain. (*Id.*) He consented to an examination, but the doctor found no signs of physical injury. (*Id.* at 5–6.) When Weeks sat in a chair to have his blood pressure taken, he did not appear to be in distress. (*Id.* at 6.) The doctor noticed a small area of dried blood on Weeks's wrists, but did not observe any abrasion. (*Id.*) The doctor gave Weeks Motrin and encouraged him to eat. (*Id.* at 6–7.)

Just after midnight on September 8, 2009, Weeks became agitated and indicated that he wanted more pain medication. (*Id.* at 7.) The doctor was called to the cell and explained that Weeks could not have more medication at that time, as he had recently received 600 mg of Ibuprofen. (*Id.* at 8.) Weeks then asked for a mattress, and an officer brought the mattress to his cell and placed it on the floor. (*Id*.) Weeks complained that he could not bend over to lift the mattress, but the officer refused to move it from the floor. (*Id.*) He began to curse loudly and make "racist remarks," and so officers closed the cell door. (*Id*.)

Several minutes later, the doctor was again called to Weeks's cell. (*Id.*) Weeks stated he felt the mattress was helping and requested a second one. (*Id.*) Although Weeks was given a second mattress, he remained agitated. (*Id.*) The doctor advised Weeks to lie down and see if the second mattress helped with his pain. (*Id.*)

Later that morning, at 5:20 a.m., Weeks appeared to have calmed down. (*Id.* at 7.) He apologized for his actions and related that he still had back pain, but that the mattresses had helped. (*Id.*) He was released from the detention center later that day.[8] (ECF No. 38-6, Ex. 6, at 4.)

## STANDARD OF REVIEW

Federal Rule of Civil Procedure 56(a) provides that summary judgment should be granted "if the movant shows that there is no *genuine* dispute as to any *material* fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a) (emphasis added). Whether a fact is material depends upon the substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). Accordingly, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Id.* "A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)). The court must view the evidence in the light most favorable to the nonmovant and draw all justifiable inferences in his favor. *Scott v. Harris*, 550 U.S. 372, 378 (2007) (citation omitted); *see also Greater Baltimore Ctr. for Pregnancy Concerns, Inc. v. Mayor and City Council of Baltimore*, 721 F.3d 264, 283 (4th Cir. 2013) (citation omitted). At the same time, the court must not yield

---
[8] Weeks is currently confined at the Maryland Correctional Institution at Hagerstown.

its obligation "to prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat*, 346 F.3d at 526 (citation and internal quotation marks omitted).

## ANALYSIS

The Supreme Court has explained that "[i]n evaluating the constitutionality of conditions or restrictions of pretrial detention that implicate only the protection against deprivation of liberty without due process of law, . . . the proper inquiry is whether those conditions amount to punishment of the detainee." *Bell v. Wolfish*, 441 U.S. 520, 535 (1979). "[U]nder the Due Process Clause, a detainee may not be punished prior to an adjudication of guilt in accordance with due process of law." *Id.* "[D]ue process rights of a pretrial detainee are *at least* as great as the eighth amendment protections available to the convicted prisoner." *Hill v. Nicodemus*, 979 F.2d 987, 991 (4th Cir. 1992) (citation and internal quotation marks omitted).

The Eighth Amendment protects prisoners against the use of excessive force by prison officials. *See Hudson v. McMillian*, 503 U.S. 1, 9–10 (1992). To determine whether force used was excessive, the court must inquire "whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." *Id.* at 6. The court should consider "the need for the application of force, the relationship between the need and the amount of force that was used, [and] the extent of injury inflicted." *Whitley v. Albers*, 475 U.S. 312, 321 (1986) (citation and internal quotation marks omitted). Other relevant factors include "the extent of the threat to the safety of staff and inmates, as reasonably perceived by the responsible prison officials on the basis of the facts known to them, and any efforts made to temper the severity of a forceful response." *Id.*

The absence of significant injury is not dispositive of a claim of excessive force. *Wilkins v. Gaddy*, 599 U.S. 34, 36–37 (2010). Rather, the extent of injury incurred is one factor

indicative of whether or not the force used was necessary in a particular situation. *Id.* Indeed, the proper focus in an excessive force inquiry is "the nature of the force, rather than the extent of the injury." *Hill v. Crum*, 727 F.3d 312, 321 (4th Cir. 2013).

Here, Weeks takes issue with the use of the PDU. He submits as an exhibit the detention center's guidelines for use of the PDU, which state: "The purpose of the [PDU] is to provide Correctional Officers with a safe, secure, and humane system for restraining *violent, out of control inmates*." (ECF No. 38, Attachment (emphasis added).) Weeks maintains that, because he was not violent, the defendants used unreasonable force in using the PDU to restrain him.

The defendants, however, were not privy to Weeks's subjective state of mind, nor could they discern whether he was under the influence of drugs or alcohol or why he behaving in an admittedly hostile manner toward them. Indeed, Weeks does not deny being uncooperative upon his arrival at the Dorchester County Detention Center and using foul language when addressing correctional staff. He also admits that he would not answer the questions posed to him during the intake process. The correctional staff could construe Weeks's irrational and hostile behavior as "out of control" and potentially violent. It is not this court's role to second-guess decisions of this nature, which require the expertise and personal observations of those whose personal safety is placed at risk. *See Sandin v. Conner*, 515 U.S. 472, 482–83 (1995); *see also Wolfish*, 441 U.S. at 547–48.

In any event, to the extent that use of the PDU in Weeks's case might be construed in hindsight as excessive, the defendants are entitled to qualified immunity. "[Q]ualified immunity protects law officers from bad guesses in gray areas, and it ensures that they may be held personally liable only for transgressing bright lines." *Gomez v. Atkins*, 296 F.3d 253, 261 (4th Cir. 2002) (citation and internal quotation marks omitted).

More troubling is Weeks's allegation that Corporal Schuyler pushed him to the floor without any justification. The available evidence, however, supports that Corporal Schuyler simply placed his hands on Weeks's chest, not that he pushed Weeks to the floor. Weeks's claim that he had stomach pain because he was punched in the stomach is inconsistent with his account that Corporal Schuyler pushed him to the floor by placing both hands on his chest. More importantly, when the doctor examined Weeks, he appeared to be in no apparent distress from the alleged injuries to his stomach or his back. Additionally, none of the defendants' affidavits or incident reports mentions Weeks being pushed to the floor; rather, they describe Weeks being escorted by the officers, and Weeks pulling away from their grasp. Corporal Schuyler admits that he then placed his hands on Weeks's chest to prevent him from moving forward.

The force used by Corporal Schuyler does not appear to have been applied maliciously and sadistically to cause harm. Whether Weeks fell to the floor or not, Corporal Schuyler's placement of his hands on Weeks's chest was for the purpose of preventing him from leaving the area without an escort. Even taking Weeks's version of events as true, to the extent that the force used by Corporal Schuyler was excessive, he is "entitled to qualified immunity if a reasonable person in [his] position could have failed to appreciate that his conduct would violate" Weeks's rights. *Meyers v. Baltimore County, Md*, 713 F.3d 723, 731 (4th Cir. 2013) (citation and internal quotation marks omitted). Weeks's admittedly disrespectful and uncooperative behavior, together with his resistance to the officers' directives, are objective evidence that support Corporal Schuyler's decision to use some force.

In light of the undisputed evidence before the court, the defendants are entitled to summary judgment in their favor. A separate order follows.


April 23, 2014                                             /s/
Date                                                  Catherine C. Blake
                                                      United States District Judge